May it please the court Robert Stone on behalf of defendant appellant Jorge Ortiz Oliva. Mr. Ortiz Oliva raises three issues in his appeal brief. A challenge to the to wiretap applications and orders, challenge to the court's denial of a motion to suppress those wiretaps, challenge to the motion denial of a search of an apartment of his the mother of his child and then the court's denial of actually what turned out to be a denial of a continuance of a trial when he asked to substitute retained counsel. So to begin with with regard to the challenge to the to the wiretap orders I've narrowed or attempted to narrow the focus to the issue is whether the order authorizes and what's what was called a roving bug and if so was that authorized under the statute. Initially in the pretrial motions it was sort of perfunctorily briefed the government raised an issue of standing. Mr. Ortiz's trial counsel again dealt briefly in his motion with the issue of standing. It was never argued at the hearing nobody raised the issue of standing at the hearing. The court did decide that Mr. Ortiz Oliva had standing to challenge the wiretap orders. Government argues again on appeal that he didn't have standing. The argument that the government made in order for Mr. Ortiz Oliva to have standing that he needed to identify each specific telephone call that he was challenging and there were roughly 47,000 calls that were recorded generally relying upon a Ninth Circuit United States v. King. Mr. Ortiz Oliva again because it wasn't really argued at the hearing. The argument that the trial counsel was that Mr. Ortiz Oliva was an aggrieved person and I think basically because he was named in every application as a primary target. He was named in every order as a primary target. So if we assume that he has standing to challenge the wiretaps. I'm sorry? If we assume your position on standing. Okay. There is standing. What's wrong with the wiretaps? The authorization? The issue that has been raised on appeal is that the technology allows and the order authorizes the government to record conversations when the cell phones that are wiretapped are powered on but are not actively engaged in a call or inadvertently. That's not what it says, right? I'm sorry? The order said. Well, it says or otherwise in use. It says actively engaged in a call. Let me understand. Authorized intercept under the CERT applies to background conversations intercepted in the vicinity of target phones 1 and 2 while the telephone is off the hook or otherwise in use. Yes. So just to understand. I understand off the hook. You could take the phone off and now normally if you take the phone off the hook as in one of the cases was what happened, as I understand, not these cases but in the precedent. Take the phone off the hook. I'm talking about a handset, not a cell phone. And you take it off the hook and you put it on the table. Normally you would just get dialed, right? Yes. There's no call in progress. So is there any ability, do we assume the government has the ability once the phone is off the hook to pick up and intercept conversations? Well, I don't know the answer to that question with regard to landlines but with regard to cell phones. Let's check landlines. Okay. I'm just talking about landlines. Okay. So now if you are on a call and you take the phone off the hook or more commonly if you're on a speaker phone, you pick up background conversations. So clearly one of the intents of this order is to say, look, if they can pick up over here anything that's going on while the phone is in use off the hook or otherwise, this reaches that. So that's a normal landline desk phone, right? I think basically my understanding of lift off the hook means that if you are in, you make a call and then you inadvertently, you don't hang up the phone. Yeah, you put it down or whatever. But the call is still, you're still engaged in a call. Off the hook or otherwise in use. Okay. So that's, you know, we can visualize that with the old phone because a lot of this language comes from, you know, pre-cell phone. Okay. So now we're talking cell phones. All right. A cell phone can go anywhere and but if it's turned on, is what you're saying, if it's turned on, there's no call in progress. It's just turned on. You know, you have your BlackBerry on. Can they pick up anything unless you start a call? The evidence that was accepted at trial was that they can. And that was, it's actually Exhibit 13 to Defendant's Motion to Suppress, which is a CNET Internet Magazine article regarding a case in New York, a federal district case in New York, where evidence was introduced in that case that the government does have the ability to go to the. Any such evidence introduced in this case? Well, it was introduced as any. A recording of any such conversation when the cell phone was not turned on. No. And that was the basis of the Court's decision that the judge asked the government. This sounds like it's entirely theoretical. Well, it is, except that if the order, if the, my argument is that if the order allowed and the technology allowed these conversations to be recorded when the cell phone was powered on but not actively engaged in a call, then that makes it a roving bug. But if we don't interpret the order that way and the government didn't interpret the order that way, what's the problem? Well, if you don't interpret it that way, I guess we're out of luck. I guess it's over. But if the government didn't interpret it that way, why should we stretch to try to read it in a way that the government didn't overreach in reading it? I really don't understand. Because I don't think it's about what the government asked for. I think I would submit it's about what the government got. And they got an order that authorized them to do that. They didn't think they got an order that let them record any time the phone was in possession, whether it was turned on or not. What's the problem? I'm sorry. I was talking when you asked the first part of that question. If the government did not understand the order authorizing the kind of interceptions that you're interpreting the order potentially to have authorized, what's the problem? Because if the order authorized it and the technology allowed it, then the government was required to get authorizations from a higher level Department of Justice official. That's under 2518 subsection 11 because it was a roving bug. And in failing to do that, this is, I believe, Giordano, it seems clear that that's an error that can't be overlooked, that the courts have said can't be overlooked because it makes the wiretap application and order insufficient on their face. If you don't have the proper authorization from the proper official, then the order is insufficient on its face and it can't be saved. So what you're saying, if the government technology is such that if they get one of these orders, warrants or orders, that whether or not they intend to do it, it gives them the capability, the potential is that once the cell phone is in use, otherwise in use, which becomes a live mic to any conversations within its range, then whether they intend it or not, given that state of technology, the roving wiretap and the senior officials at the Justice Department have to sign off. That's your argument? That's it in a nutshell, yes, Your Honor. All right. So you're going to run out of time, so I think we have that one. Why don't you talk about the search issue? With regard to the search of the mother of his child's apartment, again, we're dealing with the issue of standing, which was the basis of the court's decision. Let's assume he has standing. Let's get to the issue of whether or not he had any expectation of privacy in the bags that he left with this woman he occasionally visits and supposedly has a child with. Well, and I... And that is the standing issue. Let's look at the facts of it here, not the theory of standing. But what was his expectation of privacy? Well, if, in fact, we can connect him with the bags, which was, of course, the reason that the court said didn't even get past that to the merits or the facts of a privacy interest, then the fact that he brought the bags, put them in her apartment, that he was a frequent visitor to the apartment, that he had a child that lived there, that he had that she had he had been there three days prior, and if we're assuming that we now say that the bags that they searched were okay, that there is... Was there any evidence that he was living there while he was in town? No, but he doesn't have to be living there under old... No, I know. The living is too strong, but was he staying... Was there any evidence that he had been staying there, sleeping there while he was in town? I don't... There's nothing in the record that anybody testified that he slept. He was a frequent visitor there was, I believe, the best that I can do from the record. And this is because, again, he had an ongoing relationship with Miss Lamone, and his son was living with her. He came to the apartment and brought some of his stuff and dropped it off and went about his business. That's probably all we can reasonably infer from the record, is that he was a frequent visitor, that he left stuff, that he left bags there with... According to her testimony, he left bags with clothes in them, because he intended to return and to attend his son's kindergarten or some lower elementary school graduation ceremony. Now, he apparently was asked whether the drugs that were found in the bag were the same drugs that were found in these bags were his or whatever. Is that correct? After the fact, yes. And I don't have the case law on the tip of my tongue, but it's in my brief where that doesn't constitute voluntary abandonment. Once you find some drugs... But he did say he was denying that they were his. He denied that the drugs were his, as did Miss Lamone. Okay. So with that, I think we're at the final issue, and that's that five days before trial, Mr. Ortiz hired a... Retained a lawyer. He had... Initially had had an appointed attorney. Early in the case, he had asked for a different appointed attorney, who was... This attorney was with him for many months during the course of litigating all of these motions. But five days prior to trial, Mr. Ortiz retained an attorney and asked that he be substituted. The court said, it's fine if he sits there, but I'm not going to discharge your court appointed attorney, and I'm not going to continue the trial. And the primary reliance, I think, is on Gonzales v. Lopez, the U.S. Supreme Court, that says that not without some limitations, but generally speaking, a person who can hire a lawyer has the right to retain any lawyer that he can afford to hire. But not throw him in at the last minute. Well, I think the question is, having done that, then should the trial have been... Should he have been allowed to do that and the trial should have been continued? And I would submit that five days is not adequate time for somebody who's retained in an eight-day trial is not sufficient time to adequately prepare, even as co-counsel. What's our standard of review? Abusive discretion or? Of what the judge decided. I believe it is. I believe it is, yes. It really is the denial of the continuance of the issue, because the district court said, I'm going to deny it if you're going to require a continuance, and you've acknowledged the practical reality. So in this circumstance, is the district judge within her rights in deciding, this case has taken too long already, I'm not going to permit a further continuance? Well, she was within her rights, but I don't know that that makes it the correct decision. Again, the question, I think, is... She didn't say no to the substitution. She said no to a substitution that's conditioned on a continuance. Yes. I think it's the continuance that's really the focus here. Well, yes. She allowed him to sit as co-counsel, but then... She made clear, when she denied the motion to substitute, she said, if it's conditioned on the continuance. If the attorney had stood up, and I've seen a few of these cases, said, Judge, I'm ready to go, there's no indication the district court would have denied the substitution. I think the focus has to be on the continuance. And you've just acknowledged the continuance was a practical reality here. It was going to be necessary for a new attorney to come in. This wasn't somebody who was already up to speed. Right. And I think Mr. Levine, who was the retained attorney, made that argument to the court that, you know, I can do this, but I can't do it in five days, so we would need a continuance. How long did he ask for a reminder? I don't believe that a time period was ever... Is in the record. He just asked that it be continued, and the judge said, no, no continuance. You can sit as co-counsel, but I'm not going to continue the trial. Okay. And he did sit as co-counsel? No. Okay. All right. I'll give you a minute or so for rebuttal. Your Honor, Kathleen Vickers for the government. I am the prosecutor who handled this case in the investigative pretrial litigation and trial phase. First, as to the issue of standing, if I may just briefly address that and... Standing on which? Standing on the issue of whether or not the defendant had a right to... had established a right to challenge the wiretap orders. Wiretap. Okay. Because there's a standing issue on search, too. That's true. Your Honor, the defendant at the motion stage offered no evidence, despite the government's clear notice to him and the court, that the government was objecting on standing and in docket number 353 filed a joint memorandum that included all of the arguments against the motions to suppress the wiretap orders. In that motion, the government specifically cites King, a Ninth Circuit case that expressly says that unless you are a participant to a particular conversation or that conversation occurs on your premises, you are not an aggrieved person for purposes of Title III. And King expressly also says that the Title III definition of aggrieved person or reference to that person who's entitled to established standing does not expand the original standing law, standing rules already in place under the Fourth Amendment. There's no extra standing or broadening of the standing requirement under Title III. The defendant ---- In the world of cell phones, how is this different from being on the defendant's premises? You still have to be a participant in the conversation. That's not what you just read to us. Well, that case, King, predated cell phones, Your Honor. So your question ---- It seems to me in the cell phone world, if it's the defendant's cell phone, that's the equivalent of being on the premises of the defendant. It used to be landline phones didn't walk around. That's a good point, Your Honor. And in this case, the defendant never admitted or put on any evidence that those were his phones. As is in many ---- as in the case with many drug traffickers, the defendant chose to have other individuals named as the subscriber. So at the motion stage, he never even met that basic ---- that first rule of King. And even if we were to say, well, in the world of cell phones, you shouldn't have to actually be on the premises, then he didn't meet that rule either, because he basically distanced himself as far as he could from these conversations and these phones, and it carried through a trial where he pursued a defense that it was not he who was intercepted on these phones, that the government had the wrong guy. So just as in the backpack or the house or the suitcase or the train, the defendant has no standing to object to phones or conversations that are introduced against him if he claims no ownership in them, interest in them, or that he was even a participant in the conversations. Well, that brings me to ---- let's get past the standing thing. That brings me to a question that is troubling here, because we have this evolving technology and the question of what roving wiretap, what the Congress had in mind when it elevated the level of approval for what would be a roving wiretap. So as you know, I authored the opinion in Hermannac where we were some time ago confronting what technology seemed to be at that time. Second Circuit has read out of the roving wiretap section an order that identifies both the telephone number and the, I think it's the ESN. Yes. It identifies the device itself and then because the chips can be moved in and out, it also identifies telephone number. So the idea is to give meaning to facility and place, and I just want to understand whether this order in its potential, I understand you represented that hadn't been sought for that purpose, hadn't intercepted any such kinds of conversations or weren't going to use any. So the court accepted that and said, okay, well, that's good enough. But counsel is arguing that on the face of it, the order, if the technology exists in cell phones, to pick up conversations wherever that goes, whether or not the person's on the phone. Because that's why I was on his side of the argument. I was asking questions about the landline technology. It's off the hook or whatever. You can pick up background. You put things on speakerphone. I understand that. But the phone has to be, I understand, even on a landline phone, if the phone is off the hook, normally you would assume what would be picked up as collateral information from other people would be people who were in that vicinity of that equipment and that there was a call in progress. Somebody either forgot to hang it up or just when you're talking, you can pick up stuff in the background. So now you go to a cell phone. A cell phone you can carry around and anybody in this room could have a cell phone that is on. It shouldn't be, especially if it goes off while we're having an argument. But if it's on and nobody's making any calls, but if those become mobile microphones, intercepts, then that's what is concerning me here. And that's the implication of his argument. So how do we get around that here? Your Honor, we, the government, argued not only that we had not made such interceptions, but that such interceptions would be highly unlikely and that, in fact, this did not transform this language, which is standard for all wiretap orders issued by the office or approved by the Office of Enforcement Operations to this day. No, that's what's bothering me. Still includes the off-the-hook language. And let me see if I can settle your concerns. A roving bug or wiretap attaches to an individual, and you're right, once you have to meet those requirements, those are enhanced requirements under this citation of 2511A. These orders apply to just the single facilities. And so with the Berenik decision, which dealt with the landline in the house, how can we compare that to cell phone technology and what type of risk did the court present to the entire population in terms of Fourth Amendment intrusion? Well, as Berenik said, that was a highly fortuitous situation and highly unlikely that there would be an extended 50-minute conversation that would be incriminating. And even if it was, it was within reason under the Fourth Amendment that the government was able to use that conversation because the government had permission to intercept conversations it overheard over the specific landline. Just as in this case, the government was given authorization to intercept specific communications over these phones because these phones were determined, there was probable cause to determine that these phones would likely capture incriminating conversations regarding drug trafficking. What they don't do, what the orders don't do, is authorize what is beyond what would be a theoretical possibility that, unlike the situation where there's concern that if you leave a warrant open, you say, including but not limited to the following items, then you're giving the police carte blanche to search many different areas of the house. In the thousands of calls that were intercepted in this case, there was no situation like that. And from what I can find in the case law, there's rarely ever been a situation like that, that actually something like that would occur. So the evil that you would be concerned about occurring in such a case would be if technology was such that it would be beyond a theoretical possibility and that the government would actually design its order to capture this conversation that might occur in the bathroom when the cell phone is inadvertently powered on. It's... And what do you mean by the cell phone powered on? Do you mean actually starting a call? Right. I'm talking about powered on. The cell phone is powered on when you turn the device on, whether or not you are making a call. Right. So if I put my BlackBerry in any location and the government can, through that device, pick up any conversation within its vicinity, then that certainly seems to be the kind of thing that the roving wiretap statute was intended to address, because to do that level of intrusion beyond just the specific individual would certainly require upper-level... Assuming even that would pass constitutional muster, but that would certainly require upper-level DOJ sign-off, wouldn't it? It would, but that is not what the order says or even envisions or encompasses. I'm not aware of any technology that... I'm aware that people can get bugs that are planted in cell phones that act as a roving bug. They have permission to do that. Right. And we didn't have that technology in this case, nor did we utilize that. And also, it's very clear that the order is very specific that while the telephone is off the hook or otherwise in use... Well, otherwise in use, which is powered on. That's my concern. Well, use... What does that mean? I think, Your Honor, use means that it's being used for a call. A call function is made. Yes. It may be, and I realize this is a standard form, but at some point the Justice Department may want to reexamine the language because in today's world, there's ambiguity that invites the argument we've heard today. I will take your comments and pass them on, Your Honor. How about the other issue that he raised, the other two issues? The additional issues that are... Search of the apartment. Well, Your Honor, the search of the apartment, as was pointed out in counsel's argument, this defendant was at most occasional visitor. He had no key. He was not on the lease. There wasn't even any evidence at trial or at the motion stage that he left bags at the apartment. In fact, Ms. Lamone refused to confirm, his girlfriend refused to confirm when the bags were actually found that she knew anything about the bags, that she knew where they came from. It was the officers who had suggested to her when they were attempting to and did obtain consent that they knew he had been to the apartment and they were concerned that he might have left items there. Well, these are officers that are hoping to find something incriminating because they know that incriminating things usually are in the possession of drug trafficking individuals. But this information didn't come from the defense. It wasn't before the court. And that's why the court was without factors to conclude that the defendant had any privacy interest in the apartment or the bags. And even at trial, as he did with the calls, the defendant chose the litigative strategy of distancing himself from the nine kilos of cocaine that were found in those bags. And then, Your Honor, finally, Your Honors, finally on the Corona Garcia factors concerning the motion to substitute counsel, as the record reflects, the district court judge was very careful. There's 18 pages of transcripts, a transcript which reflects her inquiry of the defendant as to whether or not he had been given a fair defense, whether or not there was an extensive conflict with his counsel that would affect the ability to mount a defense. She concluded there was not. You've already covered the timeliness issue. It was five days before trial. The transcript also reflects the fact that we had over 30 government witnesses. And... I think we're familiar with that record. Thank you. Can you come back to the search again? I didn't quite get your point. At the motion to suppress hearing, you're saying, what was before the district court as to what the connection between the bags and Mr. Oliva was? Well, the judge actually indicated that at that hearing, she was given no information to indicate those bags were Mr. Oliva's. Okay. So when they came about because they were hoping to catch him at the apartment or whatever, and they had targeted that apartment because they knew of some connection between him and... The girlfriend. Yeah. I want to be politically correct here. The girlfriend. So they had some notion of why they were wanting to search the apartment. Correct? They did. Okay. So when they found the bags, they assumed that they were Oliva's. Well, when they found the cocaine, I think at that point they assumed they were Oliva's. All right. And they were in her closet? They were in the master bedroom closet, and Ms. Lamone was the mistress of the house, and she said that he had access to her closet, but he hadn't been there for quite a while, and again, he was only an occasional visitor. But he had been in town. He had. He was there for his son's whatever it was, kindergarten graduation or something? He was captured on his way to his son's kindergarten graduation. Okay. Thank you. Thank you, Your Honor. Your Honors, we'll submit on this. Okay. Counsel, you can have a couple of minutes. Just a couple of things. With regard to whether a cell phone is in use when it's simply powered on, I would submit that it is. It's different than a landline, because you can't receive telephone calls on a cell phone unless it's on. So when it's powered on. You can't pick up anything until it's on. Right. You can't receive a telephone call until it's on, and then I would submit that that means that you're using it to potentially receive telephone calls. With regard to the search of the apartment, Ms. Lamone did in fact testify that three days prior to the officers coming to search that Mr. Ortiz Oliva had been there and had left bags with clothes in them, and that's on excerpts of record, page, it's 130 to 134, is her testimony with regard to what happened. And what she said was that the officers came, told her we're here to search stuff that Jorge left, and she said, I can't let you search anything that's not mine, but you can search the apartment. They went. They found these bags in the master bedroom. They found the cocaine and marijuana seeds in them. Came out. She was not allowed in the bedroom. They didn't ask her before they looked in the bags whose bags they were. They came out afterwards, said, are these yours? She said, are the drugs yours? She said no. So I would submit that, well, first of all, I think the government's incorrect in their assertion that she never testified that he left anything there because, in fact, it's in the record, and that's on the pages of the excerpts. With regard to the substitution of counsel, ineffective assistance of counsel or fairness of the representation is not an issue under Gonzalez-Lopez, and that's specifically dealt with in that case. The court says it doesn't matter. What you look at is the court still can balance the court docket and the calendar. We're familiar with that docket. But you can't look at whether he was getting ineffective assistance of counsel. It's not a conflict situation. Okay. Thank you. Counsel, we appreciate the argument, and the case is submitted, and we will be in recess or adjournment. It's adjourned.
judges: Fisher, Paez, Clifton